JUSTICE GRAY
delivered the Opinion of the Court.
By order dated October 31, 1994, and pursuant to Rule 44, M.R.App.P, the United States District Court, District of Montana, certified the following question of law to this Court for consideration and decision:
Does the benefit increase provided for in Chapter 664, Laws of 1989, an amendment to § 19-5-502, MCA, which became effective on July 1, 1991, apply to members of the Montana Judges’ Retirement System who retired after the date of enactment but prior to the effective date of the legislation?
We accepted jurisdiction of the certified question by order dated November 15, 1994, and stated that we would decide the certified question on the basis of the statement of facts contained in the federal court’s Certification of Question of Law, as well as the Record described in the Certification. We hold that the referenced benefit increase does not apply to members of the Montana Judges’ Retirement System who retired after the enactment, but before the *498 effective date, of the legislation and, therefore, answer the certified question in the negative.
The facts contained in the Certification, and upon which our decision is based, are as follows:
L. C. Gulbrandson (Gulbrandson), an Arizona resident, was an active member of the Montana Public Employees’ Retirement System (PERS) and, subsequent to its creation, Judges’ Retirement System (JRS) from January 4, 1960 through August 31, 1989. For service as a district court judge and supreme court justice during this period, Gulbrandson was credited with 29 years and 8 months of service credit in JRS. Since September 1, 1989, Gulbrandson has been a retired member of JRS.
Carole Carey, Eleanor Pratt, Terry Tiechrow, Troy McGee, Sr., Fred Flanders, and Carol Lambert are Montana residents appointed by the governor to the Public Employees’ Retirement Board (Board), pursuant to § 2-15-1009, MCA. The Board is charged under Montana law, Title 19, MCA, with the administration of JRS, among other state administered governmental retirement systems.
During Gulbrandson’s period of active membership on the bench in PERS, from January 4, 1960, through June 30, 1967, he contributed 5.6% of his salary to PERS. On July 1,1967, JRS was formed as a retirement system separate from PERS. All Gulbrandson’s service credit in PERS was transferred to JRS. From July 1, 1967, through August 31, 1989, Gulbrandson contributed 6% of his salary to JRS.
During the 51st Montana Legislature which convened in January 1989, Senate Bill 241 was introduced by Senator Mazurek and others. This bill, as introduced, provided for additional state funding to JRS and provided for an increase in retirement benefits for those years served by a Judge after the 15th year from 1% to 2% of final salary for each such year of service.
This bill, as amended, was signed by the Governor of Montana on May 13, 1989, and enrolled as Chapter 664, Laws of 1989 (Ch. 664). As enacted, Ch. 664 was effective on July 1, 1989, except for two sections which were to be effective on July 1, 1991. The more pertinent of these delayed-effect sections, Sec. 3, provided as follows:
Section 19-5-502, MCA, is amended to read:
Upon retirement from service, a member shall receive a service retirement allowance which shall consist of the state annuity plus the member’s annuity. The member’s annuity shall be the actuarial equivalent of his aggregate contributions at the time of retire *499 ment. The state annuity shall be in an amount which, when added to the member’s annuity, will provide a total retirement allowance of 3 1/3% per year of his final salary for the first 15 years’ service and 1.785% per year for each year’s service after 15 years’ service.
Sec. 3, Ch. 664 was one of two sections of that legislation which had a delayed July 1, 1991, effective date. The remainder of the legislation, including a mechanism for increased state funding for JRS, was effective July 1, 1989.
Gulbrandson was an active member of JRS at the time of the legislative enactment and for more than three months beyond enactment. As an active member during this time, Gulbrandson continued to contribute 6% of his salary to JRS.
Had he completed his term, Gulbrandson’s term of office would have expired January 6, 1991. Gulbrandson resigned voluntarily on August 31, 1989.
Beginning September 1, 1989, Gulbrandson began to receive “a total retirement allowance of 3 1/3% per year of his final salary for the first 15 years’ service and 1% per year for each year’s service thereafter,” as provided in § 19-5-502, MCA, on that date. Gulbrandson has continued to receive a total retirement allowance based on these percentages.
Between May 13, 1989, and July 1, 1991, there were 6 active members of JRS with more than 15 years of service. Gulbrandson was the only member with more than 15 years of service who voluntarily terminated service during that period.
On January 23, 1992, Gulbrandson appeared before the Board informally seeking Board consideration of the application of Sec. 3, Ch. 664, initially as to all members retired prior to July 1,1991, then as to himself. The Board requested an Attorney General’s Opinion on the issues.
On December 4,1992, the Attorney General of Montana issued an opinion to the Board which concluded that Ch. 664 did not increase the retirement allowance for those JRS members who retired prior to July 1, 1991, even those who retired after the date of enactment.
On September 13, 1993, Gulbrandson filed a formal petition with the Board for redetermination of his retirement allowance. The Board denied the petition on September 23, 1993.
Members of JRS with more than 15 years of service credit who retired after July 1,1991, have received “a total retirement allowance of 3 1/3% per year of his final salary for the first 15 years’ service and *500 1.785% per year for each year’s service after 15 years’ service,” as provided in § 19-5-502, MCA, after that date.
Jack L. Green, a JRS member active from May 1, 1963, through December 31, 1992, with 29 years, 8 months service credit in JRS, has at all times received a total retirement allowance based on 1.785% of final average salary for all years subsequent to his 15th year of service.
1. Is Gulbrandson entitled to the increased retirement benefit provided in Section 3, Chapter 664, Laws of 1989, amending § 19-5-502, MCA, which was enacted in 1989 and effective July 1, 1991, under the plain language of the statute?
Our function in construing and applying statutes is to effectuate the legislature’s intent. United States v. Brooks (1995), [270 Mont. 136], 890 P.2d 759, 761. To determine legislative intent, we first look to the plain meaning of the words used in the statute. Stansbury v. Lin (1993), 257 Mont. 245, 249, 848 P.2d 509, 511. If the legislature’s intent can be determined by the plain language of the words used, we may not go further and apply other means of interpretation. Prairie County Co-op v. Kalfell Ranch, Inc. (1994), 269 Mont. 117, 124-125, 887 P.2d 241, 246. It is only when the intent cannot be determined from the language of the statute that we will examine legislative history. Matter of Kalfell Ranch, Inc., 887 P.2d at 246.
As of its effective date on July 1, 1991, Section 3, Chapter 664 provides an increased retirement benefit to JRS members with more than 15 years’ service “upon retirement from service.” The plain meaning of the statutory language is that a member is entitled to the increased benefit upon his or her retirement from service on or after July 1,1991. Such plain, clear and unambiguous language expresses the legislature’s intent and permits no further interpretation by this Court. Matter of Kalfell Ranch, Inc., 887 P.2d at 246.
Here, Gulbrandson retired from service nearly two years before the effective date of Section 3, Chapter 664. He did not retire again on or after July 1, 1991. Based on the plain meaning of the statute, we conclude that he was not entitled to the increased retirement benefit contained in § 19-5-502, MCA, as amended by Chapter 664, upon his retirement prior to July 1, 1991.
Gulbrandson argues that denial of his entitlement to the increased retirement benefit impermissibly impairs his contract with the JRS in violation of Article II, section 31, of Montana’s Constitution. Under the three-part test we apply to determine whether legislation violates the impairment of contracts clause, the initial inquiry is whether the law has operated as a substantial impairment of the *501 contract. Matter of Yellowstone River (1992), 253 Mont. 167, 182-83, 832 P.2d 1210, 1219 (citations omitted). Thus, in order to address Gulbrandson’s argument, we must determine the parameters of his contract to determine whether the contract guarantees him the benefit increase contained in Section 3, Chapter 664. If it does not, then denial of the increased retirement benefit cannot impair the contract.
At the time of Gulbrandson’s retirement prior to the effective date of Section 3, Chapter 664, JRS members with more than 15 years’ service were entitled to 1% per year of current salary for each year of service after 15 years. See § 19-5-502, MCA (1989). This clear and undisputed entitlement is our starting point in determining the terms of Gulbrandson’s retirement benefit contract.
Gulbrandson argues that the entirety of Chapter 664 became operable law as of May 13,1989, when it was signed by Governor Stan Stephens. Accordingly, and notwithstanding the delayed effective date of the Section 3 amendment to § 19-5-502, MCA, he asserts that his entitlement to the increased retirement benefit contained in Chapter 664 became a vested part of his contract as of May 13,1989. He relies, in part, on Leonard v. City of Seattle (Wash. 1972), 503 P.2d 741. Leonard does not support his position.
In Leonard, the Washington Supreme Court considered whether a retired police officer’s pension could be forfeited under a statute enacted after the officer’s retirement which forfeited pension rights upon a felony conviction. The court refused to allow the forfeiture, stating that rights to a public pension “are to be determined as of the latest enactments applicable to the recipient in effect prior to actual retirement ....” Leonard, 503 P.2d at 747. Applying the Leonard language here, it is clear that the latest enactment applicable to Gulbrandson which was in effect prior to his retirement was § 19-5-502, MCA (1989), because Section 3, Chapter 664 was not effective until July 1, 1991.
Nor is Gulbrandson’s reliance on 73 Am. Jur. 2d Statutes § 360 (1974), well placed. The portion of that discussion on which he relies centers on whether a bill becomes law on passage by the legislature or only upon approval by the governor; that is not the issue presently before us. We note that Gulbrandson does not quote a later part of the discussion which points out that legislatures often are authorized to prescribe the time when a statute takes effect. 73 Am.Jur. 2d Statutes § 360 (1974). That is precisely what the Montana legislature did here.
*502 The terms of Gulbrandson’s retirement benefit contract are determined pursuant to the statutes in effect at the time of his retirement on August 31,1989. The amendment to § 19-5-502, MCA, via Section 3, Chapter 664, was not yet effective on that date. Therefore, we conclude that Gulbrandson’s contract does not include the increased retirement benefit contained in Section 3, Chapter 664 and, as a result, his contract was not impaired by denying him entitlement to that increased benefit.
2. Does the denial of the increased retirement benefit contained in Section 3, Chapter 664, violate Gulbrandson’s constitutional right to the equal protection of the law?
Gulbrandson argues that the Board’s interpretation and application of Section 3, Chapter 664 creates impermissible classifications of JRS retirees and singles him out based on his retirement between the date the governor signed Chapter 664 and the effective date of Section 3 thereof. His stated equal protection challenge is to the amended statute as applied by the Board, rather than to the statute by its terms, and is based on his contention that he is entitled to the increased retirement benefit pursuant to § 19-5-502, MCA, as amended. Because we conclude above that Gulbrandson is not entitled to the increased retirement benefit under the plain meaning of the amended statute, we deem his equal protection argument to be directed at the provisions of the amended statute, that is, a facial challenge to the law itself.
Article II, section 4 of the Montana Constitution provides that “[n]o person shall be denied the equal protection of the laws.” The purpose of the equal protection clause “is to ensure that persons who are citizens of this country are not the subject of arbitrary and discriminate state action.” Cottrill v. Cottrill Sodding Service (1987), 229 Mont. 40, 42, 744 P.2d 895, 897; quoting Godfrey v. Mont. State Fish & Game Com’n (1981), 193 Mont. 304, 306, 631 P.2d 1265, 1267. We determine whether state action violates equal protection by applying either a strict, intermediate or rational basis standard of scrutiny. The determination of which standard is appropriate depends on the facts and the rights involved. See Arneson v. State (1993), 262 Mont. 269, 272-73, 864 P.2d 1245, 1247-48; Cottrill, 744 P.2d at 897.
The most stringent standard, strict scrutiny, is imposed when the action complained of interferes with the exercise of a fundamental right or discriminates against a suspect class. Eastman v. Atlantic Richfield Co. (1989), 237 Mont. 332, 337-38, 777 P.2d 862, 865. The intermediate standard is applied in cases involving rights *503 that are significant, or important, but not fundamental. Butte Community Union v. Lewis (1986), 219 Mont. 426, 432-34, 712 P.2d 1309, 1312-14. The lowest standard, the “rational basis” or “reasonable relationship” test, applies in most cases. To withstand rational basis scrutiny, the law or state action need be only rationally related to furthering a legitimate state purpose. Arneson, 864 P.2d at 1248.
With regard to the proper standard of scrutiny for this case, Gulbrandson makes a passing argument that intermediate scrutiny applies. He does not, however, distinguish our decision in Arneson, where we rejected intermediate scrutiny in favor of the rational basis standard in the context of an equal protection challenge to retirement benefit statutes. Arneson, 846 P.2d at 1248. Consequently, we analyze Gulbrandson’s claim under the rational basis test.
To a certain extent, nearly all legislation sets forth classifications regarding applicability, benefits and recipients; the fact that some of these classifications are imperfect does not necessarily mandate a conclusion that they violate the equal protection clause. Arneson, 864 P.2d at 1248. Moreover, every possible presumption must be indulged in favor of the constitutionality of a challenged statute. Arneson, 864 P.2d at 1248; citing State v. Safeway Stores (1938), 106 Mont. 182, 199, 76 P.2d 81, 84.
Section 19-5-502, MCA, as amended by Section 3, Chapter 664 effective July 1,1991, created two classes of retired judges, with those retiring after that date receiving an increased retirement benefit for years of service in excess of 15 years. The issue before us is whether a rational relationship exists between the delayed effective date of Section 3, Chapter 664, which results in Gulbrandson’s lack of entitlement to the increased retirement benefit, and a legitimate government interest. See Arneson, 846 P.2d at 1248-49.
The factual and legal equal protection issues in this case are similar to those addressed by the Michigan Supreme Court in Hughes v. Judges Retirement Bd. (Mich. 1979), 282 N.W.2d 160. In Hughes, two retired judges instituted an action for a writ of mandamus increasing their retirement benefits under a 1974 amendment to the retirement system; both judges had retired before the effective date of the amendment. The writ was denied and the judges appealed. Hughes, 282 N.W.2d at 162-63.
Applying the rational basis test, the Michigan Supreme Court quoted earlier cases stating that “legislation is not unconstitutional because ... it benefits a particular class, so long as the law operates equally upon those within a particular class.” Hughes, 282 N.W.2d at *504 167 (citations omitted). The court first concluded that the legislature did not intend to provide the increased benefit to judges retiring prior to the effective date of the retirement system amendment. It then discussed the purpose of the 1974 amendment at issue, which was to induce judges to remain in service as judges. Given that purpose and the fact that no incentive to remain on the bench can be offered to a judge who has already retired, the “distinction created between judges who retire prior to the amendment and those who retire after the amendment is [not] arbitrary, unreasonable, or devoid of rational basis.” Hughes 282 N.W.2d at 168. On that basis, the Michigan court held that the classification created by the amendment was “rationally related to the object of the legislation in which it is made.” Hughes, 282 N.W.2d at 168. The Hughes rationale is equally applicable here.
On its face, as discussed above, the delayed effective date of the amendment to § 19-5-502, MCA, establishes the legislature’s intent to provide the increased retirement benefit to those judges retiring on or after the July 1, 1991, effective date. The fact that the amendment created two classifications does not produce an equal protection violation; to this extent, the delayed-effect amendment is not unlike most legislation which, by its very nature, contains or produces classifications regarding benefits, applicability and the like by virtue of a change in statute at a particular point in time. See Arneson, 864 P.2d at 1248.
Moreover, there is no dispute that the classification created by the amendment “operates equally upon those within the particular class.” See Hughes, 282 N.W.2d at 167. All judges who retired prior to July 1, 1991, receive the retirement benefits to which they were statutorily entitled at the time of their retirement; those who retired after July 1, 1991, also receive the retirement benefits to which they were statutorily entitled at the time of their retirement, including the increased benefit provided as of that date via Section 3, Chapter 664.
In addition, as was the case in Hughes, one of the purposes of Section 3, Chapter 664, even before the effective date was delayed, was to provide an incentive to judges to remain in service by increasing their retirement benefit for years of service in excess of 15 years; indeed, the delayed effective date can be viewed as an additional inducement in that judges with significant numbers of years of service might be encouraged to remain in service not merely until the July 1, 1991, effective date, but for some time thereafter. There is no question but that the purpose of the amendment, including the delayed effective date, is a legitimate governmental interest. Given *505 the stated purpose, and the fact that the incentive to remain on the bench cannot be successful with regard to judges retiring prior to its effective date, we cannot say that the distinction between judges retiring prior to, and after, the effective date of the amendment is in any way arbitrary, unreasonable or devoid of rational basis. See Hughes, 282 N.W.2d at 167-68.
Gulbrandson advances an argument that the distinction at issue relates not to when a judge retires, but to equality of retirement benefits among judges with similar years of service. He compares his own situation to that of retired district court judge Jack Green, who retired December 31, 1992. At the time of their respective retirements, each was credited with 29 years and 8 months of service. With regard to the amount of retirement benefit received for years of service in excess of 15 years, Judge Green received 1.785% per year, while Gulbrandson received 1% per year.
The fatal flaw in this comparison relates to our discussion regarding the plain meaning of § 19-5-502, MCA, as amended; namely, that the amount of retirement benefit to which a member of the JRS is entitled is calculated pursuant to the statutes in effect at the time of the retirement. When Gulbrandson retired, § 19-5-502, MCA (1989), entitled him to 1% of current salary per year for each year of service exceeding 15 years. Judge Green, on the other hand, retired well after the effective date of the amendment to § 19-5-502, MCA, and, therefore, was entitled to the increased retirement benefit which became effective on July 1, 1991. While this difference in benefit entitlement between retiring judges with identical periods of service may be less than perfect, such imperfection does not mandate a conclusion that it violates Gulbrandson’s right to equal protection of the laws. See Arneson, 864 P.2d at 1248. In addition, relative to our discussion of the purpose of the amendment, that purpose was furthered by Judge Green’s remaining in service after its effective date; it could not have been furthered by Gulbrandson, who retired prior to eligibility for the increased retirement benefit.
We conclude that § 19-5-502, MCA, as amended by Section 3, Chapter 664, is not unreasonable or arbitrary. We further conclude that it is rationally related to a legitimate governmental interest in providing an incentive for judges remaining in service for longer periods of time.
We hold that the retirement benefit increase provided in Section 3, Chapter 664, Laws of 1989, an amendment to § 19-5-502, MCA, which became effective on July 1, 1991, does not apply to members of the *506 Montana Judges’ Retirement System who retired after the enactment date, but prior to the effective date, of the legislation. Therefore, we answer the certified question in the negative.
JUSTICES TRIEWEILER, NELSON and LEAPHART concur.